Good morning, Your Honors. Eric Wise for Appellant Pacific Merchant Shipping Association. I'd like to reserve two minutes at the end for rebuttal. May it please this Court, CARB's fuel requirements violate the Commerce Clause to the extent that they regulate the conduct of ships outside of the three-mile limit. You didn't raise any Commerce Clause argument in the District Court, though. We did, Your Honor. Beginning at page 8 of our opening memorandum in that case and in the reply memorandum beginning at page 14, we did raise the issue of the exclusive federal jurisdiction over commerce in the zone outside of the three-mile limit. We specifically asserted, alleged in the complaint at paragraph 3, I think it is, or page 3, that the Commerce Clause, that this violated the Commerce Clause. And most importantly, I think, under the standards of this circuit, the judge ruled on the issue, specifically referring to that allegation in the prayer or that request in the prayer, which related back to the Commerce Clause. I got you. In any event, the Submerged Lands Act is what sets the territorial limits, but it is the Commerce Clause which makes it inappropriate for the state to regulate outside of those limits. This flows from Cooley as interpreted and as outlined by the Ninth Circuit decision at Hammond, in which the court specifically drew a line between the three-mile limit, which was permissible for the regulation of the ballast in Alaskan waters, and stated that if, in fact, the state had regulated outside, it would run afoul of Cooley. The reason for this is because of the need in international affairs for regulation of ships in international maritime commerce to be uniform throughout the country. And the decision in Hammond and in the discussion of Cooley in U.S. v. Locke reflects that that doctrine from that 1851 case remains vital and alive as a matter of American jurisprudence. If there's a need for uniformity, wouldn't that need apply as well inside the three-mile limit? I don't think so, Your Honor, because the idea is, for example, in the— How does the difference then in the need for uniformity impact, let's say, your clients, you know, inside and outside the three-mile limit? I think that the recognition is that the reason for the need for uniformity is that within the— outside of the three miles, as Judge Pregerson says in footnote 12 to Hammond, the reason for the need for uniformity outside of the three-mile limit is that only by negotiation of international treaty can this country participate in an international environment which will adopt international rules that will be enforceable by this country outside of the territorial limits. This state regulatory scheme doesn't interfere with that, right? I mean, the country is doing that. The country is doing that, yes, but the principle, I think— we don't know what's going to happen when we have a double standard here, beginning in— Well, did the CARB say, you know, their regulations sort of, you know, automatically sunset if there's a, you know, something from a higher authority? Your Honor, this—only if it's consistent with the CARB rule. In other words, CARB is dictating what a—essentially national policy here, because what happens is— That's a medical situation, though, right? For now, there's no conflict. For now, there's—at present, there is no direct conflict, but our argument is not that there is a conflict. It's that the Constitution does not permit the state to regulate the ships outside of their territorial limits with respect to internal operations of the ship. Mr. Weiss, aren't you, as a practical matter, reading too much into the purpose of the SLA? Doesn't it go too far to suggest that the legislation establishes some sort of an absolute territorial boundary beyond which the state law are totally barred from a few minor exceptions for such matters like piloting and environmental purposes? Isn't that exactly—aren't you making a little bit too much of the SLA? Well, I think that our principal argument is that the SLA sets this territorial limit, and the question of what flows from that territorial limit is a separate question. And the— It sounds like you're almost abandoning your implied preemption argument. No, we're not, Your Honor, because when Congress adopted the SLA— Well, you said all it does is set the limit. Right. It sets the limits, and what that has a practical effect, if you look at Justice Harlan's opinion in the U.S. versus Louisiana case from 1960, he has a good explanation or explication of what the effect of establishing territorial limits are. Specifically, as between the nation and the state, those boundaries are fully effective. And as Warren, the Supreme Court of California, in addressing a case involving the fishing outside of the three-mile limit in California, indicates, that sets the boundaries for all purposes, political and any other purpose. Suppose the State shows that action outside of the territorial limit of the State affects the State. What then? Well, the effects test. I think that there is a question as to whether or not the State could, for example, prosecute or hold the ships civilly liable for the effects that occur in California. But that's not what this statute does. And that's not this case. This statute does not impose any civil or criminal liability for the effects of the emissions. What it does do, it's a complete violation of the rule, without any question of whether or not there was an effect from the emissions. The violation of the rule and the conduct which is the subject of this is the use of the fuel. And because it's the use of the fuel, there is no, this case does not fit the effects test. In the effects test, what happens is somebody commits an act in France, which has an antitrust effect in California. What do you say, in effect, the effects test can only be applied retroactively, so to speak? In other words, you can't apply it prospectively and say, well, I know this will have an effect, so we want to prevent it. Yes, that's our position. Is there a case that says that? No, but there's no case that says otherwise. In other words, the point is what they are doing is they're reaching out and they're not, this is not an effects-based statute. This statute specifically prohibits. Well, there's a lot in the record about, you know, maybe supposed effects, right? That's true. And you haven't contested any of those. No, we have not. Your brief, your very extensive brief, really didn't challenge the effects analysis of using this type of fuel, and that it's uncontested. I would take it, then, that California, especially Southern California, is confronted with a very extremely serious problem, the emissions of seagoing vessels, and that this is a tremendous health hazard to the residents of that area. I mean, I think you have to take that as a given, because you didn't challenge it. We did not challenge that. What we are challenging, though, is the method by which this is done. In other words, in the prior case, for example, they had implemented a rule which did, in fact, address the effects. The prior case against you, or the prior case that you brought. Right. On the emission standard. Right. And in that case, the emissions in that case were the target. In other words, the effect was the target in that case. This case, the effects are not the target of the rule. The only conduct which is, it's a complete offense in this case, if, in fact, you use the wrong fuel outside the limits. But California has decided, and I don't think you could say it's irrational, that the use of certain types of fuel cause cancer and other types of respiratory problems, and they have regulations which now prohibit it from entering their space. And so the question is not one of effects at all. I think you've got to recognize that. The question is whether they have jurisdiction to solve a problem which is unquestionably present. That's true. And the effects test is only an exception to the principle that a state has no extraterritorial jurisdiction. Well, you look at the SLA as like a real estate conveyancing thing. This is real estate that California has now. But there's nothing in the SLA that says the state does not have the ability to regulate within or outside of that boundary. It's merely a real estate lawyer would say a conveyancing, meets and bounds, description of what they now own if they want to drill or whatever they want to do there. I think that the Supreme Court in the Louisiana case that I just cited, which is at 363 U.S. page 1, and it's at page 35 of that opinion, describes how the establishment of the boundaries have much more significance with respect to defining what the territorial seas are of the state and of the country than simply a conveyance. But is there anything in the SLA which says that you can even infer from the SLA that says that the state cannot legislate beyond that territory which is now ceded to them by the Federal Government? I guess what we're asking the Court to do is infer that the SLA established the territorial limits for all purposes. And then from that, then you're up against White's implied presumption, which the Supreme Court said we should never engage in. Right. And you're asking for an implied presumption that that can be, which the district court refused your order. Sure. But why if the implied presumption in that case, again, was in the context of regulation by the State of something that they'd always regulated? It's not the same here. And what we're talking about here is now that there is a territorial effect. There is a restriction on jurisdiction. And the question is whether that restriction extends to prohibit this regulation. And it's our position that it is. I see that my time is up. Thank you very much. I will save the rest of my time. Thank you. May it please the Court. My name is Nicholas Stern, and I represent James Goldstein, Executive Officer of the California Air Resources Board. Thank you, Mr. Goldstein. Mr. Stern. Go ahead. Congress could preempt the vessel fuel rules, but it has chosen not to. Both before and after the enactment of the Submerged Lands Act, the federal government has had paramount authority over maritime commerce, both within three miles and beyond. But paramount authority is not exclusive authority. When Congress wants to make its authority exclusive, it can do so. But in the area of regulating the fuel used by ocean-going vessels, it has chosen not to. PMSA argues that Congress has not delegated its authority to the states to regulate the fuel used by ocean-going vessels, but PMSA has it backwards. Instead, Congress has not chosen to deprive California of its authority to regulate the fuel used by ocean-going vessels. Therefore, there is no preemption. There is no requirement for uniformity. Except there's a tremendous impact on foreign commerce. You make little of the effects on the cost and so forth, and their briefing reflects the monumental cost for shipping coming into California if they have to adhere to this regulation. And it's not insignificant. There are costs involved in purchasing the more expensive fuel. You're absolutely right, Your Honor. And if California can do it, why can't every other state which borders the ocean and bays and so forth, why can't they do the same thing? And we wind up with a balkanization of the United States. Judge Cowen, that same issue came up in Huron-Portland Cement. And the Supreme Court found that because there was no evidence of a patchwork, if you will, developing in the other states, that argument was not right, not timely. In any case, if other states do decide to adopt similar types of rules, if Washington and Oregon do, say, then you'll have to look at those rules. Are they identical to California's rules, in which case there would be no additional burden on interstate commerce? Or is there some difficulty that makes it that ‑‑ The burden here is unprecedented on foreign and interstate commerce, to my knowledge. I don't see any other case where states have made regulations which are going to cost what foreign commerce will be saddled with if we uphold this. Well, I have a couple of responses. One is that the cost per ship visit is substantial, but if you break it down to, say, the container on a ship, and this sort of breakdown was also done by the Supreme Court in Ray, if you break it down by what the ship carries, it's actually very small, a matter of pennies or dollars. As far as the ability of states to regulate beyond their territories based on the effects within, it is well accepted, widely accepted law, that under those circumstances states can exercise their police power to protect the health and safety of their citizens. What's your response to Mr. Wise's argument that, well, there's no case that sanctions can affect the prospective application of the effects test? You know, in other words, sanctions are a state law on the basis of its prospective effect. Well, I'm not entirely sure that's true. If you look at the Florida Supreme Court's case, Stepanski, that we cite in our brief. That's a rape case? Yes, it was. Anyway, Florida at the time had a statute that specifically allowed the state to, where more than, I think it was where more than half of the passengers on the ship were embarking in Florida, then it was allowed to exercise its jurisdiction. On the high seas? On the high seas, yes. What other case can you cite, it was done in your brief, where this cost, $30,000 per ship visit estimated, has been upheld by the Supreme Court that has this unprecedented effect upon foreign commerce? You know, it costs too much. These ships will say, what are we going here for? We might as well go to Canada, go to South America. You might say it's a penny here and a penny there. Senator Hyde would say that after a while it adds up to a couple of million dollars. Well, first of all, among the undisputed facts is that the PMSA said that the cost of these regulations is, I believe, not, I believe the phrase they used was that it was not unreasonable or overly burdensome. And they said that was undisputed. And that's at the supplemental asserts of record, page 20. Secondly, as I mentioned, in the Ray case, there were some significant costs, and the court broke it down by how much those costs would be per, I believe it was barrel of oil, carried by an individual tanker. And as I've already mentioned, if you break down the cost by what these ships carry, it's only, I think the South Coast Air Quality Management District determined it was only pennies for a pair of sneakers or for a plasma TV carried in from, say, Japan. But more importantly, and looking more carefully at your Commerce Clause issue, what one can do is to balance the benefits of the regulations against the burdens. Here, PMSA, the plaintiff, the moving party, has made no attempt to engage in such a burden. We have not had pike balancing. There's no question that this regulation is discriminatory under the Commerce Clause. So what we're left with is if the burdens to interstate commerce caused by these costs that you raise exceed the benefits to the state. And the only evidence in the record at this time is that the benefits are enormous. Well, they don't deny the benefits are enormous, but they say that you're regulating in an area where the federal government has exclusive regulation, that your regulation is oppressive, and you can't cite one case that's ever been decided which has imposed this type of cost on foreign commerce. Well, they do say that there is a requirement of uniformity, but what they don't say is that under Barclays Bank the Supreme Court has held that it is up to Congress to decide whether uniformity is required. And here, clearly, Congress again and again has said that uniformity in the area that we're dealing with, regulating the fuel of ocean-going vessels, does not require uniformity. And if Congress didn't like these regulations, I presume they could occupy the field and do whatever it wanted. Absolutely. They could easily preempt them. They've had opportunity and opportunity to do so. They could have done it in the Clean Air Act. They did not. They could have done it in the Submerged Lands Act. They did not. And they could have certainly done it in the implementing legislation for Annex 6, which is the legislation having to do with the international treaty on these subjects. Instead of preempting, instead of saying that their authority is exclusive, they included a savings clause that preserves California's ability to adopt these regulations. Did you want to pass the baton to your colleague? Yes, I will. Thank you very much. Good morning, Your Honors. May it please the Court, I'm Barbara Baird, District Counsel for the South Coast Air Quality Management District. I want to respond to a couple of points that were made during Mr. Stern's argument. First, the question of whether there have been regulations applied beyond the three-mile zone surrounding states that are preventative or prophylactic in effect. And I would submit that the Alaska fishing cases, which were held to apply beyond the state's boundaries, were such an example of such a case where those rules were applied. They were regulatory rules, not criminal rules applied on the high seas. And also, regarding the question about the assertion that the plaintiffs have argued that there's never been a case with such costs imposed on international commerce, I don't believe they made that argument at all, certainly not in the trial court. Indeed, we could have put in record evidence about other regulations that the State has imposed that do impose costs on international commerce. What comes to mind most obviously is the State's automobile standards that regulate manufacturers of automobiles throughout the world and undoubtedly impose costs. So I would request that the Court not base any decision on that assumption. And, indeed, that goes back to the State's regulations on automobiles. You mean the regulations that impose a more stringent standard than the national standard? Correct. Which adds costs to the manufacturer. Correct. The three basic points I'd like to make, just briefly, I think the Court's recognized that in and of itself the Submerged Land Act, there's no court holding that it preempts anything. And to the extent courts deal with the Submerged Land Act outside the three-mile zone, they again say it doesn't preempt, distinguishing between the territoriality of the State and the ability to regulate navigation on the waters. So the Submerged Land Act doesn't create a preempted field. But if it did create a preempted field of commerce beyond the three-mile zone, we would argue that the Court would not have been justified in granting summary judgment simply because there remains a dispute as to whether the effect on interstate commerce is both direct and substantial. In the PG&E case, the U.S. Supreme Court found that even though the California moratorium obviously had a tremendous effect on the ability to install nuclear reactors, it was not an effect of new – excuse me, it was not a regulation of nuclear safety. It was not a direct regulation. Similarly, in here in Portland Cement, the Court held that the regulation was not a regulation of commerce but a regulation of air pollution. And we think those precedents hold. We've already discussed the issue of the fact that although PMSA argues that the costs are high, when placed in context they are remarkably insubstantial. And we need to look also at the benefits, which show that 500 lives are saved each year in the South Coast alone, other hundreds the rest of the state, and some $33 billion annually in benefits due to health costs avoided are incurred in the state. So we don't think PMSA has shown that it's entitled to summary judgment. I would agree that Congress has not expressed a need for uniformity. This Court has held that in the field of environmental regulation, unlike the field of ship design standards, the Clean Water Act dictates in favor of not requiring uniformity. There is a federal policy that indicates there's no need for uniformity internationally in fuel oil standards because, as we pointed out in our brief, the United States ratified the MARPOL Annex 6, under which the emission control area was established, as allowing states to adopt more stringent fuel oil requirements as conditions of port entry. And EPA also has allowed the states to regulate fuels for marine vessels. And so, indeed, EPA is not the body responsible for adopting rules to make sure the states attain air quality standards. The states are the bodies responsible. We've shown that we absolutely need this rule to attain the PM 2.5 standard before 2015. So far as we are aware, there's no other state that can make that showing. If there are other standards in the future, but those will come into effect after the emissions control area comes into effect nationwide. So the risk of other states adopting rules similar to California requiring compliance before 2014, I think, is small. Finally, on the port entry conditions, the district court held that the rules are similar to those conditions which are accepted part of international law. The U.S. Supreme Court in Patterson upheld a rule which applied to conduct outside the United States because it prohibited prepayment of wages for seamen on ships coming into the ports and intruded more into the internal discipline of the ship as opposed to its external effects on the state. Thank you. Thank you, Ms. Baird. Mr. Weiss, back to you. Could you just comment on the Warner and Dillis case, the First and the Fifth Circuit? They dealt with piloting, but they seem to be against you, aren't they? Well, they held that regulation of pilotage beyond the state boundaries was proper. Our point is we don't have to show that there is no regulation possible, but only that this particular conduct, that is, regulation of ships in maritime trade and the fuel used on those ships, is improper. And we think it's beyond the constitutional power of the state to reach outside of its territorial limits to regulate onboard conduct such as fuel use. And that principle really derives from Cooley and I think is implied by the decision in Locke where they talk about the limited extraterritorial effect of in-water, in-state regulations, the extraterritorial effect of those regulations. And here what we have is direct regulation of instrumentalities of commerce, that is, ships. So I don't think you apply the reasonableness test or anything like that. We have a case in which the state is directly regulating the out-of-state conduct of the instrumentalities of commerce, the ships. And that's not appropriate. I see that my time is up. But that's our essential argument is that it's beyond their power to do that under the Commerce Clause. Mr. Weiss, thank you. Mr. Stern, Ms. Baird, thank you as well. The case does start. You just submitted.
judges: Cowen, Tashima, Silverman